## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

CALDERA PHARMACEUTICALS, INC.,

        **Plaintiff,**

v.                                                              Civ. No. 10-222 JH/RHS

JOEL J. BELLOWS and BELLOWS &
BELLOWS, P.C.,

        **Defendants**.


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court for consideration of six separate motions for summary judgment filed by Defendants [Docs. 180, 181, 182, 183, 184, and 185].  The Court has reviewed the briefs and evidence filed by the parties, along with the applicable law, and will grant certain motions and deny certain motions as discussed herein.

## BACKGROUND

The Court has previously issued an opinion [Doc. 54] denying in part a motion to dismiss filed by Defendants, and the parties are familiar with the pertinent facts and allegations; therefore, the Court only briefly summarizes the facts and procedural history.  This case arises from a breakdown in the relationship between an attorney, Defendant Joel J. Bellows ("Bellows"), that attorney's law firm, Defendant Bellows & Bellows ("Law Firm"), and a client of the attorney and the law firm, Plaintiff Caldera.  In 2005, Plaintiff was a start-up company interested in developing commercial applications for certain patents licensed from an entity named Los Alamos National Security ("LANS").  A representative of Plaintiff approached Bellows, an attorney practicing in Chicago, Illinois, to inquire whether Bellows would be interested in investing in Plaintiff's stock. In October 2005 Bellows purchased 105,000 shares of stock for $210,000.  In addition, the Law

Firm became corporate counsel for Plaintiff.  The Law Firm represented Plaintiff in various matters, such as the preparation of a Private Placement Memorandum ("PPM") which was used to solicit further investment from third parties.  Some time in 2007, the relationship between Bellows and Plaintiff soured and Bellows requested that Plaintiff buy out his shares of stock.  He also requested the same relief on behalf of a woman named Seddie Bastanipour ("Bastanipour"), a bookkeeper or accountant associated with Bellows.  Bastanipour had provided services for Plaintiff and in addition had purchased 4,000 shares of stock for $8,000 in May 2006.

Plaintiff agreed to buy out both Bellows and Bastanipour but this did not occur. Subsequently Plaintiff allegedly discovered certain deficiencies in the patents licensed from LANS and filed a lawsuit against LANS.  Bellows and Bastanipour, represented by the Law Firm, then filed suit in Illinois state court against Plaintiff; Dr. Benjamin Warner, Plaintiff's president ("Warner"); and Sigmund Eisenchenk, a member of Plaintiff's board of directors ("Eisenschenk").  This case, which will be referred to in this opinion as the Illinois case or the stock-fraud case, involved allegations by Bellows and Bastanipour that both Warner and Eisenschenk had fraudulently misrepresented the pedigree of the patents licensed to Plaintiff and had thereby misrepresented the value of the shares of stock purchased by Bellows and Bastanipour.

Plaintiff responded to the filing of the Illinois case by filing the instant lawsuit against Bellows.[1]  Plaintiff's claims include claims for breach of contract, professional negligence, and breach of fiduciary duty, all based on allegations that can generally be characterized as legal malpractice claims.  In addition, Plaintiff brings a claim for fraud and for tortious interference with contract.  As noted above, Defendant has filed six different motions for summary judgment which, if granted, would completely dispose of the case.  These motions include two that are purportedly directed at all of Plaintiff's claims; one that concerns the fraud and tortious-interference claim; one

---

[1]Plaintiff also was involved in litigation against Bastanipour, but she is no longer party to any lawsuit involving Plaintiff.

that is directed at a specific claimed basis for liability, involving directors and officers liability insurance; one attacking Plaintiff's request for punitive damages; and one requesting renewed dismissal of claims the Court has already dismissed.[2]   The Court will address each motion separately.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See  EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011).  In reviewing a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party. *See id.*  In addition, all reasonable inferences from the evidence must be drawn in favor of the non-moving party.  *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  Materials that may be considered for purposes of summary judgment include depositions, documents, electronically stored information, affidavits or declarations, stipulations , admissions, interrogatory answers, and other materials.  Fed. R. Civ. P. 56(c)(1)(A).

## DISCUSSION

### A.  Motion for Summary Judgment on All Counts – Doc. 181

Although Defendant styles this motion as directed at all counts of the amended complaint,

_____

[2]The Court notes this type of split-pleading practice, breaking what is in reality a single motion for summary judgment into distinct and individual pleadings, is strongly discouraged in this District.  It forces the parties to file multiple motions, responses, and replies, when a single omnibus document would suffice.  Perhaps more importantly, it causes extra work for this busy Court, which has had to read and analyze overlapping and often duplicative arguments and to review attachments to briefs that in a number of instances were identical to attachments the Court had already reviewed because they were also attached to a different brief.  For this reason, some judges in this District have gone so far as to reject multiple motions like the ones filed in this case and force the offending party to file a single summary-judgment motion containing all arguments the party might have in support of a grant of summary judgment.  *See, e.g., Cash v. Lockheed Martin Corporation*, 09-CV-901, Doc. 81 (D.N.M.); *Rice v. City of Santa Fe*, 00-CV-1669, Doc. 199 (D.N.M.).  Counsel for Defendants are instructed to avoid this type of motion practice in the future.

the arguments presented concern only Plaintiff's claims for legal malpractice, whether those claims are couched as breach of contract, breach of fiduciary duty, or negligence claims.  Plaintiff has alleged that Defendant committed malpractice in a number of different ways; these alleged acts of malpractice took place during his and the Law Firm's representation of Plaintiff, and perhaps (depending on the facts) after that representation ended.[3]   The elements of a claim for legal malpractice include the existence of an attorney-client relationship; the attorney's neglect of a reasonable duty; and resulting proximately-caused loss to the client.  *See Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor*, 115 N.M. 159, 848 P.2d 1086, 1089-90 (N.M. App. 1993).

Defendant points out that in professional-negligence lawsuits, expert testimony is usually needed to establish a standard of care as well as the professional's breach of that standard.  *See Rodriguez v. Horton*, 95 N.M. 356, 622 P.2d 261, 264 (N.M. App.1980).  Although Plaintiff has presented an expert who has opined on those topics, Defendant discounts that expert's report and testimony on two grounds:  first, that he is not qualified to provide expert opinions in this case; and second, that his opinions are based solely on the Rules of Professional Conduct and therefore cannot establish the applicable standards of care, or breach thereof, for the malpractice claims raised in the amended complaint.

**1. Expert's Qualifications:**  Plaintiff has proffered the opinions of Edward X. Clinton, an

---

[3]The Court notes that in some jurisdictions, a legal malpractice claim may not be brought for actions taken following termination of the attorney-client relationship.  In these jurisdictions, the appropriate relief for such post-representation acts is found in an action for breach of fiduciary duty.  *See, e.g., TVGA Eng'g, Surveying P.C. v. Gallick*, 846 N.Y.S.2d 506, 509-10 (N.Y.A.D. 4 Dept., Nov. 09, 2007).  Other courts have rejected this view and determined that for certain claims at least a malpractice action remains viable even for post-representation acts.  *See, e.g., Damron v. Herzog*, 67 F.3d 211, 214-16 (9th Cir. 1995).  The Court recognizes there is a factual dispute in this case as to when, exactly, the attorney-client relationship between Plaintiff and Bellows and the Law Firm terminated.  However, in this case the standards applicable to a breach-of-fiduciary-duty claim appear to be identical to those applicable to a claim for legal malpractice.  Therefore, the Court need not weigh into this largely inconsequential dispute at this time.

attorney licensed in Illinois with over 20 years of experience.[4]  Defendant contests his qualifications by pointing out, *inter alia*, that Mr. Clinton has not previously testified as an expert in any court; that he is not a member of any of various ethics subgroups for attorneys in local, state, or national bar associations; and that his publications concerning ethics have for the most part appeared on his personal internet blog.  Plaintiff responds by noting Mr. Clinton's 20-plus years of experience, his involvement as counsel in several malpractice cases, his actions in informally advising other attorneys concerning ethical matters, and his publications, be they internet-based or not.

In the particular circumstances of this case, the Court finds Mr. Clinton's qualifications adequate to allow him to express opinions concerning the applicable standard of care in this case, with one exception discussed below. This is not a case involving an esoteric area of law such as patents.  Most of the issues revolve around basic principles of attorney-client relationships with which every attorney should have more than a passing familiarity.  These issues include conflicts of interest between an attorney and client, or between a former client and a current client; an attorney's duties of loyalty and confidentiality toward both former and current clients; and other issues implicit in every attorney-client relationship.  Any competent attorney who performs sufficient research into these areas, as Mr. Clinton claims to have done, should be able to become proficient enough to inform the jury of the applicable standards of care and provide an opinion as to whether those standards were breached.

Importantly, in this case the Court is in a position to assess the testimony of each side's

---

[4]Both parties' experts are Illinois-based attorneys, indicating the parties agree that knowledge of Illinois law is the requisite qualification for analysis of these claims of legal malpractice.  The Court is not so sure.  While legal malpractice can sound in either contract or tort, in New Mexico it is generally a tort cause of action.  *See Leyba v. Whitley*, 120 N.M. 768, 907 P.2d 172, 176 (N.M. 1995).  The Court has already pointed out [Doc. 54] that New Mexico law will apply to Plaintiff's tort claims.  At this point it does not appear to make a difference since New Mexico and Illinois law in this area appears to be similar.  Should New Mexico and Illinois law diverge on any particular topic, however, an expert's knowledge of Illinois law will be irrelevant as to that topic.

expert and ensure that no misstatements of the applicable law reach the jury. The standards of care that will be applied in this case, and about which the experts will be testifying, are legal standards, and the Court will be able to independently determine what exactly those standards should be. It is also significant that Defendant, while attacking the standards of care proffered by Mr. Clinton, has not explained how those proposed standards might vary from the "true" standards that should be applied in this case. In fact, as discussed below, the Court has researched the law with respect to a few of the standards proposed by Mr. Clinton and has found they are in accord with a substantial amount of case law.[5] This "spot check" on Mr. Clinton's opinions supports the Court's determination that Mr. Clinton's qualifications are sufficient to allow him to express opinions concerning the standards of care applicable to the issues raised in this case, and as to whether Bellows' or the Law Firm's actions fell below those standards of care.

There is one exception to this ruling, and one caveat. The exception concerns Plaintiff's claim regarding Directors and Officers ("D and O") liability insurance coverage. Mr. Clinton admitted he is not an expert on this type of insurance, and this area of law, unlike that of attorney-client relationships, does not appear to be one that just any attorney can become expert in with a modicum of research. Therefore, Mr. Clinton will not be allowed to testify as an expert witness with regard to any aspect of the D and O claim.

As to the caveat, it arises out of the fact that the Court is in just as good a position to determine the legal standards applicable to this case as are the parties, and the Court has the final say concerning the law. Should the Court become aware, or be made aware, that an expert's proffered opinion is contrary to the law as the Court perceives it, the expert will not be allowed to present that opinion to the jury. Possible examples of such a situation include Mr. Clinton's

_____

[5]The Court has not researched and analyzed every standard proposed by Mr. Clinton – that is the parties' job. However, the Court has checked enough of his legal propositions to determine whether his qualifications as an expert in this area are adequate.

potentially blanket prohibition against an attorney filing suit against a former client in anything other than a fee dispute, if the lawsuit involves the subject-matter of the prior representation. [Doc. 181-A, pp. 167-68]  The Court's admittedly truncated research into this question reveals this opinion might not accurately reflect the law, as an attorney may in some circumstances be allowed to bring suit as a private individual, even against a former client. *See, e.g., Coppola v. Proulx*, 2012 WL 3068792 (D. Nev. 2012) (unpublished) (attorney not categorically barred from bringing suit against former clients for damages allegedly suffered as purchaser harmed by their misrepresentations).  On the other hand, Defendant's expert appears to have opined that there is no restriction on Bellows' or the Law Firms' use of confidential information gained during the representation of Plaintiff, as far as the ability to use that information to support his own claim or that of Bastanipour against Plaintiff.  [Doc. 193-B, p. 80]  This opinion also may be contrary to the applicable law on the subject.  *See, e.g., Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 250 P.3d 1115, 1121-23 (Cal. 2011) (attorney prohibited from using confidential information to harm former client); *Case of Wood*, 634 A.2d 1340, 1344 (N.H. 1993) (attorney disciplined for same).  The parties will need to educate the Court further as to these areas of the law before either expert will be allowed to provide an opinion on these subjects.

> 2. **Rules of Professional Conduct as Legal-Malpractice Standards:** Defendant also faults

Mr. Clinton's opinions for being based, as Defendant argues, solely on various rules of professional conduct.  Defendant directs the Court to cases indicating the Rules of Professional Conduct are not intended to create grounds for malpractice liability.  *See, e.g., Richter v. Van Amberg*, 97 F.Supp.2d 1255, 1261 (D.N.M. 2000).  This is true; however, there are any number of cases indicating that some Rules, at least, and in particular certain of the Rules involved in this  case, are codifications of pre-existing common law and thus may be used in an essentially  short-hand manner to state the applicable standard of care in an action for legal malpractice.  *See, e.g., id.* (a legal malpractice claim is not barred simply because its substance enters the realm of conduct covered by the Rules); *Alpha*

7

*Capital Management, Inc. v. Rentenbach*, 792 N.W.2d 344, 356 (Mich. App. 2010) (Rule 1.9);

*Bevan v. Fix*, 42 P.3d 1013, 1027-28 (Wyo. 2002) (Rules 1.6, 1.9). Mr. Clinton opined that in some

situations the Rules constitute codifications of the common law, and supported his opinions by

referring to case law as well as to the seminal treatise on legal malpractice, Ronald E. Mallen and

Jeffrey M. Smith, *Legal Malpractice* (2012 ed.). Mr. Clinton's statement of the law is exactly

correct – a Rule of Professional Conduct may indeed in some circumstances be a statement of the

applicable standard of care. It will be up to Defendant to specifically dispute Mr. Clinton's opinions

with citation to the law, rather than a broad-brush argument that it is not enough to recite a Rule of

Professional Conduct. Since that has not yet occurred, Defendant's argument on this point must be

rejected.

      For the foregoing reasons, this motion for summary judgment will be denied.

### B.  Motion for Summary Judgment on All Counts – Doc. 184

      Again, this motion purports to be directed at all claims advanced in the amended complaint,

but appears to be directed solely at the claims for legal malpractice. The motion does incorporate

two other motions filed by Defendant, but contains no discussion of the substance of those motions.

They will be discussed separately. This motion raises the argument that Plaintiff has presented no

expert testimony sufficient to establish the damages that have been caused by Defendants' claimed

acts of malpractice, and particularly by the filing and contents of the Illinois case. As Defendant

argues, a client must have suffered some type of compensable harm from the actions of his or her

attorney before the client may maintain an action for legal malpractice. *See Hyden v. Law Firm of*

*McCormick, Forbes, Caraway & Tabor*, *supra,* 848 P.2d at 1089-90. Depending on what type of

damages are requested, expert testimony may or may not be necessary to support this aspect of a

client's claim; if the harm is readily ascertainable by reasonable lay persons, the expert-testimony

requirement will not apply. *See, e.g., First Union Nat. Bank v. Benham,* 423 F.3d 855, 861 (8th Cir.

2005) (expert testimony not required in legal malpractice case if common-knowledge rule applies);

*Dubreuil v. Witt*, 835 A.2d 477, 483 (Conn. 2003) (same).

According to its interrogatory answers, Plaintiff claims to have suffered the following types of harm as a result of Defendants' actions:  (1) Diminution in fair market value of the company following the filing of the Illinois case, due to false allegations made in the complaint; (2) Loss of an economic-development loan from Los Alamos County, also due to the Illinois case; (3) Loss of an investment by a firm called Sun Mountain, due to the same cause;  (4) payment of attorney's fees for defense of the Illinois case as well as other legal actions; (5) tax penalties incurred due to the failure to file quarterly federal tax returns for two quarters in 2007, because Plaintiff assumed Defendants would be filing them; and (6) expenses incurred to recreate corporate books and records retained by Defendants, or at least not returned to Plaintiff, following termination of the attorney-client relationship.  [Doc. 195-A]

Defendant's motion is aimed primarily at the first three aspects of Plaintiff's damages claims.  Defendant maintains there is no expert testimony that can establish Plaintiff's fair market value prior to the Illinois lawsuit, so there is no basis for a diminution-in-value analysis.  Defendant also argues there is no evidence Sun Mountain knew about the Illinois case when it was deciding whether or not to invest in Plaintiff.  Finally, Defendant contends the Los Alamos County loan has actually been approved by the loan committee, and is simply awaiting final approval from the County Commission.

The Court agrees there appear to be serious problems with all three of these damage claims. For the fair-market-value claim, Plaintiff intends to rely on pre-lawsuit valuations ranging from $30 million all the way to $600 million.  Without getting into details at this point, however, the evidence so far does not appear to support any of these figures as a legally valid, pre-Illinois-case fair market value for Plaintiff.  The $30 million figure was disavowed by Plaintiff's own expert, Mary Warmus, who would not recognize it as a fair market value for Plaintiff.  [Doc. 184-B, pp. 51-52, 79]  She characterized it as essentially an arbitrary figure arrived at by Plaintiff's management and based only

on an also arbitrary share price of $5.71 per share.  In fact, Plaintiff's own Private Placement Memorandum, provided  to potential investors, contained a disclaimer indicating the $5.71 figure was entirely arbitrary and not indicative of the present or anticipated value of the company.  [Doc. 184-C] The larger valuation figures thrown around by Plaintiff appear to have similar serious flaws. The source of one of those figures testified that it was not intended to be a fair-market-value figure, but was simply based on assumptions provided by Plaintiff itself, which did not turn out to be accurate.  [Doc. 184-D, pp. 86-89]  For example, the witness, Mr. Hamilton, testified that even though he knew there were issues with Plaintiff's patent rights, he assumed those rights were in order; obviously if the patent rights were not in order, Plaintiff's value as a company would be seriously impacted.

As to the damages claims related to Sun Mountain and Los Alamos County, similar problems appear.  Sun Mountain's representative testified that at the time he was discussing a possible investment in Plaintiff, he was not even aware of the Illinois case, and it was not a factor in the investment decision.  [Doc. 184-E, pp. 8-9]  The Los Alamos County loan, as Defendant has argued, was approved by the loan committee, indicating the Illinois case had no effect on that committee's decision.  [Doc. 184-A, pp. 389-90]  In accordance with the foregoing, at trial the Court will not allow presentation of any evidence concerning diminution in value, lost investment from Sun Mountain, or denial of a loan from Los Alamos County.  Defendant's motion will be granted in part as to these damages claims.

However, certain of Plaintiff's other claims for damages appear to be viable, indicating summary judgment should not be granted on the damages issue as a whole at this time.  For example, one of Plaintiff's claimed acts of malpractice is that Defendants simply stopped providing services that Plaintiff assumed were still being provided, and did not notify Plaintiff of this cessation of representation.  As a result, according to Plaintiff, two quarterly tax returns were not filed with the IRS, and Plaintiff incurred financial penalties.  Defendants did not address this item of claimed

damages in their submissions, and the Court must therefore accept Plaintiff's assertion as true.  If the jury finds Defendants did not properly notify Plaintiff of the termination of their services, Plaintiff may be able to prevail on this claim and recover the damages requested.  Similarly, Plaintiff contends Defendants did not return its corporate records and books, which forced Plaintiff to recreate these items at its own expense.  It is true Plaintiff has not yet specified a monetary figure for this loss; instead Dr. Warner vaguely referred to billings from Plaintiff's accountant, which may or may not have been provided to Defendants during discovery.  [Doc. 184-A, p. 285]  However, it appears to be a logical and reasonable item of damages that, if properly identified, could be recovered should Plaintiff prevail on the failure-to-return-client-property claim.  Finally, Plaintiff relies on the fact that it has been forced to expend substantial amounts of money on attorney's fees in defending against the Illinois case, among other things.  Plaintiff referred to attorney billing statements as factual support for this item of damages, and submitted those billings to the Court.  [Doc. 195-A, pp. 493-94; Doc. 195-L]  Defendant has not argued that such fees would not be a proper item of damages should Plaintiff prevail on the claim for breach of the duties of loyalty or confidentiality.  At this time, therefore, it does not appear Defendant has managed to eliminate all possible aspects of damage from this case, which means the motion for summary judgment must be denied in part.

### C.   Motion for Summary Judgment on Claims for Fraud and Tortious Interference With Contract – Doc. 183

Defendant has presented this motion as a combined motion for summary judgment and motion to dismiss, attacking the sufficiency of the fraud allegations made in Plaintiff's amended complaint.  At this late stage of the proceedings, the Court will address it as a motion for summary judgment.  Evidence has been submitted for the Court's consideration, and the Court's rulings will be based on that evidence rather than any perceived pleading deficiencies in the amended

complaint.[6]

**1.  __Fraud Claims:__** In New Mexico the elements of a claim of fraud are as follows:  (i) a representation of fact was made which was not true; (ii) either the falsity of the representation was known to the party making it, or the representation was made recklessly; (iii) the representation was made with the intent to deceive and to induce the plaintiff to rely on the representation; and (iv) the plaintiff did in fact rely on the representation.  N.M. UJI 13-1633.  In discovery the parties have identified three allegedly false statements that form the basis of Plaintiff's fraud claim.  First, Bellows allegedly told Dr. Warner that D and O coverage would not be available to Plaintiff, or would not be available at a reasonable price; second, Bellows allegedly told Dr. Warner that Bellows and Ms. Bastanipour had both signed the Shareholder Agreement containing an arbitration provision; and third, Bellows promised to honor the privacy policy contained in the retainer agreement entered into by Plaintiff, Bellows, and the Law Firm.  The Court will address each of these statements in turn, albeit in reverse order.

Plaintiff contends the parties entered into a retainer agreement containing a privacy policy, under which Defendants agreed to keep secret any information obtained during their representation of Plaintiff.  Plaintiff argues Bellows breached this agreement by disclosing confidential information in the Illinois case, particularly in the complaint.  The evidence concerning this statement is patently insufficient to support a claim of fraud.  There is black-letter law in New Mexico and in most, if not all, other jurisdictions to the effect that a promise to take certain action in the future does not become fraudulent simply because the promise is subsequently not honored.  *See Register v. Roberson*

---

[6] Before treating a motion to dismiss as a summary judgment motion, a district court must give notice to the parties "to prevent unfair surprise."  *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987) (quotation omitted).  There is no unfair surprise when a party submits material beyond the pleadings in support of or in opposition to a motion to dismiss because the party's actions "put[ ][him] on notice that the judge may treat the motion as a Rule 56 motion."  *Id*. at 260.  Here, because the motion is styled as one for summary judgment as well as a motion to dismiss, and because all parties submitted evidence outside of the complaint, additional notice is not required before treating defendants' motion as a motion for summary judgment.

*Constr. Co.*, 106 N.M. 243, 741 P.2d 1364, 1367 (N.M. 1987).  Admittedly, there are exceptions to this rule.  If the promise is based on facts that are peculiarly within the knowledge of the maker of the promise, or is based on concealment of known facts, the promise can be considered fraudulent. *Id.*  In other words, if there is evidence that the promise is made with the intent to deceive the recipient, and that at the time the promise is made the maker has no intention of honoring it, the promise will be actionable as fraud.  *Cf. id.*  In this case, however, there is no such evidence.  The only evidence is that Defendants entered into an agreement to keep Plaintiff's information confidential, and later allegedly breached that agreement.  From this evidence it is simply not possible to draw an inference that Defendants, at the time they entered into the retainer agreement, had no intention of honoring the privacy policy.

The next allegedly fraudulent statement is Dr. Warner's contention that Bellows told him he (Bellows) and Ms. Bastanipour had both signed a Shareholder Agreement containing an arbitration clause.  According to Plaintiff this statement constituted fraud because it was not true, and Bellows and Ms. Bastanipour filed a lawsuit against Plaintiff rather than submitting to arbitration.  Again, significant lack of evidence prevents this aspect of the fraud claim from going forward.  The evidence submitted by Plaintiff is completely vague concerning the details of the alleged statement by Bellows.  There is no indication when, where, or under what circumstances the statement was made, or whether it was made orally or in an e-mail or in another form of writing. Instead, Dr. Warner testified only that it was "my understanding" that Bellows and Bastanipour had signed the Agreement.  [Doc. 183-D, pp. 361-62]  Fraud must be proved with particularity, by clear and convincing evidence; Plaintiff has not submitted sufficient evidence to meet its burden of proving this particular statement was ever made.  *See* N.M. UJI 13-1633;  *Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 451 (Mich. 2008).

Furthermore, there is no evidence as to how Plaintiff relied on this statement to act in any way.  Plaintiff's position appears to be that the statement was made, it was false, and Plaintiff

suffered harm as a result, but this is not sufficient.  There must be evidence that Plaintiff acted in reliance on the statement, to Plaintiff's detriment.  UJI 13-1633.  For example, no evidence was presented to show that Plaintiff sold the stock Bastanipour or Bellows only because Plaintiff was told they signed the Agreement.  Dr. Warner's "understanding" that the Agreement had been signed cannot be the basis of a claim for fraud.

The final allegedly fraudulent statement is Bellows' alleged statement to Warner that D and O insurance would not be available to Plaintiff because it was a start-up company.  In reliance on that statement, Plaintiff did not purchase such insurance.  Subsequently, Plaintiff allegedly suffered harm because it was forced to pay attorney's fees defending Warner and Eisenschenk against the Illinois case brought by Bellows and Bastanipour, and for defending Warner against counterclaims filed by LANS in the patent lawsuit filed by Plaintiff.  Again, it is difficult to fit this statement into the traditional fraud framework.  There is no evidence Bellows was attempting to obtain some type of personal benefit by making this statement to Warner; the best Plaintiff can come up with is that Bellows was a shareholder in Plaintiff and would indirectly benefit by keeping costs down, and D and O insurance is admittedly quite expensive.  Furthermore, Warner several times characterized the statement not as an absolute factual statement that D and O insurance is never available to start-ups, but as a statement more in the form of an opinion, that such insurance is not available at a reasonable price.  [Doc. 183-D, p. 406; Doc. 180-C, p. 557]  Of course, an erroneous opinion, as opposed to a false statement of fact, generally cannot give rise to a claim for fraud.  *See, e.g.,* *Papatheofanis v. Allen*, 148 N.M. 791, 242 P.3d 358, 361 (N.M. App. 2010).

However, viewing the evidence in the light most favorable to Plaintiff, it can be inferred that Bellows made a factual statement that D and O insurance would not be available at all to a start-up like Plaintiff.  [Doc. 194-A, p. 148]  This brings us to the next difficulty with this claim—there must be evidence that Bellows knew the statement was false when he uttered it.  Based on the evidence in the record, the closest Plaintiff can get is Bellows' own testimony that he did not tell Warner D

and O insurance should not be purchased; instead, he recommended that the insurance be purchased but that Plaintiff not overpay for it. [Doc. 194-D, pp. 137-38] This indicates Bellows knew D and O coverage could be purchased for a start-up, although it would be expensive. To credit that testimony, however, the Court would have to reject the evidence most favorable to Plaintiff – that Bellows informed Warner that D and O insurance would not be available to a start-up at all. It is difficult to twist the evidence in the tortured manner that would allow an inference that Bellows knew the statement, which he denies making at all, was false.

Finally, Plaintiff cannot prove that the harm it suffered—the incursion of attorney's fees in defending Warner and Eisenschenk—occurred as a result of Bellows' allegedly false statement. As Defendants correctly point out, Plaintiff has presented no credible evidence to show that D and O insurance would in fact have been available to Plaintiff. Both Warner and Michael Lyon, officers of Caldera, testified that they did not obtain quotes for D and O insurance, [Doc. 180-C, pp. 407, 556-557; Doc. 180-D, p. 139], and there is no testimony from any insurance company that it would have been willing to issue a D and O policy to Plaintiff. Furthermore, Plaintiff has presented no evidence that if such insurance was available that it would have covered the legal claims brought against Warner or Eisenschenk.[7] Plaintiff's legal expert, Mr. Clinton, expressly testified that he did not know what would have been covered by any D and O policy or if a defense would have been provided. [Doc. 180-A, pp. 197-98] Plaintiff has submitted only the testimony of it officer, Lyon, who was involved in the operations of the company during the time in question. According to Lyon, he has worked with start-ups in the past, and D and O insurance is "pricey" for start-ups, with costs ranging from $30,000 to $180,000 per year or higher. [Doc. 194-B, pp. 106-07] Lyon also testified

---

[7] The claims in question include LANS' counterclaims against Warner for breach of his employment contract with LANS, a conversion claim against Warner, and a claim for trespass to chattels, also against Warner. In the 2008 stock-fraud lawsuit against Caldera, Warner, and others, the claims against Warner were for fraud under Illinois securities laws, violation of the Illinois Consumer Fraud Act, and common law fraud. Thus, the claims were a mix of breach of contract, intentional torts, statutory fraud, and common law fraud.

that D and O insurance typically covers fraud claims, or claims of gross negligence or misconduct by board members or officers of a company.  [*Id.* p. 108]  He had no knowledge or understanding of whether a typical D and O policy covers contractual disputes.  [*Id.*]  Finally, there is nothing in the record setting forth Lyon's opinion regarding whether typical D and O policies cover intentional torts, such as conversion or trespass to chattels.

The central issue here is whether D and O coverage would have been available to Plaintiff, and would have covered at least some of the legal claims and counterclaims brought against Warner or Eisenschenk.  In the Court's view, the question of what types of legal claims are typically covered by a D and O insurance policy is outside the scope of the understanding of the average layman. Indeed, the construction of insurance policy provisions is a question of law.  *Outboard Marine Corp. v. Liberty Mut. Ins. Co*., 154 Ill.2d 90, 108, 607 N.E.2d 1204 (1992); *Nellis v. Farmers Ins. Co. of Az.*, 272 P.3d 143, 2012-NMCA-020 ¶ 21 (N.M. Ct. App. 2012).  Lyon testified briefly that he has worked with start-ups obtaining insurance, and he expressed some knowledge about the cost of D and O insurance.  He also made a conclusory statement that D and O insurance provides coverage for fraud claims.  However, there is no evidence that Lyon is qualified to provide opinions regarding insurance coverage.  Further, Lyon has not been offered, disclosed, or qualified as an expert, nor has the Plaintiff provided the Defendants with an expert report.  Lyon's testimony is not adequate not only because his qualifications as an expert were not established by any evidence submitted to the Court, but because he was not disclosed as a Rule 26 expert and did not file a Rule 26 report.   As a result, the basis of his opinions is also in question.

This case is similar to *Metro Allied Ins. Agency v. Lin*, 304 S.W.3d 830, 53 Tex. Sup. Ct. J. 174 (Tex. 2009), wherein the court concluded  that a government contractor had failed to show that its damages were proximately caused by an insurance broker's failure to procure a general commercial general liability ("CGL") policy for him.  The contractor produced no CGL insurance contract that would have been, or normally was, sold by the broker and which provided coverage

16

of his breach of contract damages .  He also offered no CGL insurance agreement available in the market that would have provided coverage for the claims against him, nor any expert testimony regarding coverage for indemnity claims under a surety bond in a typical CGL policy.  The Texas Court of Appeals concluded that because plaintiff had failed to meet his burden to supply evidence of an insurance policy that would have covered the alleged injury, he had failed to demonstrate that failure to obtain the insurance was a proximate cause of his damages.  *Id*. at 836.  The same is true here.  As a result, summary judgment will be granted to the Defendants on Plaintiff's fraud claim.

    **2.  Tortious Interference with Contract:**  The elements of a tortious-interference-with-contract claim in New Mexico are that the defendant had knowledge of a contract between the plaintiff and a third party; the third party breached the contract; the defendant played an active and substantial part in causing the third party to breach the agreement; damages flowed from the breach; and the defendant induced the breach without justification or privilege.  *See Guest v. Berardinelli*, 195 P.3d 353, 363 (N.M. App. 2008).  Plaintiff contends there was a contract between it and Ms. Bastanipour, requiring her to arbitrate any claims she might have arising out of her purchase of stock in Plaintiff.  Plaintiff also contends Bellows induced Bastanipour to breach that contract by filing the Illinois case rather than submitting her claims to arbitration, and that Plaintiff suffered harm as a result.

    This claim suffers from several deficiencies and will not be allowed to proceed.  First, there is little evidence that Bastanipour actually did enter into an arbitration agreement with Plaintiff.  She testified she did not sign any documents in connection with her stock purchase, and Plaintiff has no evidence to the contrary.  [Doc. 183-F, pp. 30-31]  Plaintiff is left with the assertion that it was Warner's "understanding," as discussed above, that Bastanipour had signed the Shareholders Agreement.  This is not sufficient to allow an inference that she actually did so.  Plaintiff's best argument appears to be based on the Private Placement Memorandum ("PPM") prepared by Bellows & Bellows and issued in January 2006.  According to the PPM, anyone purchasing shares pursuant

17

to that offer agrees to be bound by the Shareholders Agreement, which in turn contains the arbitration provision.  [Doc. 196-A, p. 9]  Defendants argue that Bastanipour did not purchase her shares pursuant to the PPM, and note she paid only $2.00 per share rather than the $5.71-per-share price quoted in the PPM.  However, Warner testified that Bastanipour was given the $2.00 price only because she asked to buy stock before the PPM was issued, and he honored the same price given to Bellows.  [Doc. 183-D, pp. 361-63]  He also testified the deal was not consummated prior to issuance of the PPM, but afterward.  [*Id.*]  At this stage of the proceedings, viewing the evidence in the light most favorable to Plaintiff, the Court will accept that Bastanipour was in fact bound by the arbitration provision of the Shareholders Agreement.

The more difficult problem for Plaintiff with respect to his claim is there is no evidence Bellows knew Bastanipour was subject to the arbitration provision and induced her to breach that provision.  Bellows testified that Bastanipour initiated the litigation and was the first plaintiff.  [Doc. 193-C, p. 200]  There is no evidence that Bastanipour knew she was subject to an arbitration provision, but was convinced by Bellows to ignore it and file suit.  Absent such evidence, Plaintiff cannot satisfy the inducement element of tortious interference with contract.  Accordingly, summary judgment will be granted on that claim.

### D.  Motion for Summary Judgment on D and O Insurance Claims – Doc. 180

Plaintiff has raised the alleged misrepresentation concerning availability of D and O insurance as both a legal-malpractice claim and a fraud claim.  The fraud claim has already been dealt with above, and that discussion will not be repeated here.  As to the malpractice claim, Defendant makes the following arguments:  first, there is no expert testimony establishing the standard of care an attorney should meet with respect to D and O insurance, and that a breach of that standard occurred; second, there is no evidence Plaintiff could have obtained such insurance if it had attempted to, or that the coverage would have included the types of claims and counterclaims brought against Warner or Eisenschenk; and third, the only evidence of damages is speculative,

because there was no breakdown of the amounts of attorney's fees incurred in defending these individual defendants as opposed to the corporate defendant, Plaintiff.

The Court has identified an initial problem that was not discussed by the parties. That is, was Bellows' alleged misrepresentation made in his capacity as corporate counsel for Plaintiff, or as a shareholder? After all, the D and O advice is not typical legal advice concerning a principle of law, but advice related to commercial matters such as the availability or cost of a certain type of insurance. Bellows himself muddied the waters by testifying that he was not acting in either capacity when he discussed the D and O issue; instead, he was acting as "an MBA." [Doc. 194-D, pp. 142-43] Since Bellows created this potential difficulty by becoming both attorney for and investor in Plaintiff, for purposes of this motion the Court will assume his D and O advice was given in his capacity as an attorney.[8]

It is true that in legal-malpractice cases, expert testimony is often necessary to establish an attorney's standard of care in a certain situation, as well the existence of a breach of that standard. *See, e.g., Rodriguez v. Horton,* 622 P.2d 261, 264 (Ct.App.1980). In this case Plaintiff's expert, Mr. Clinton, testified that it fell below the standard of care for Bellows to inform Plaintiff that D and O insurance would not be available, without first researching the question. However, as the Court has determined above, Mr. Clinton admitted he is not an expert in matters related to D and O insurance and he therefore cannot express expert opinions on that subject. On the other hand, it may not take an expert to opine that an attorney should not falsely inform a client that certain insurance is not available without first researching the matter. *See, e.g., First Union, supra,* 423 F.3d at 861 (expert testimony not required in legal malpractice case if common-knowledge rule applies); *Dubreuil, supra*, 835 A.2d at 483 (same). For purposes of this motion, the Court will find the standard of

---

[8]The Court notes it would seem logical that an MBA would also be subject to a professional-malpractice claim for providing patently deficient advice, although the Court has not researched that question.

care has been established, and  there is an issue of fact as to whether it was breached.

The more difficult issue is the same one discussed with respect to the fraud claim – whether there is sufficient evidence that D and O insurance would have been available at a price Plaintiff would have been willing to pay, and that the policy would have covered the claims Plaintiff has had to defend against on behalf of Warner and Eisenschenk.  As discussed above, Plaintiff has failed to come forward with evidence to create a genuine issue of material fact on these questions. Accordingly, the Court will grant Defendants' motion for summary judgment.

### E.  Motion for Summary Judgment on Request for Punitive Damages – Doc. 182

As Plaintiff points out, this motion is entirely derivative of Defendants' other motions.  The argument is that since no compensatory damages may be recovered on any of Plaintiff's claims, no punitive damages may be recovered either.  As the Court has discussed above, certain of Plaintiff's claims will go forward to trial, as will certain of the claims for damages.  Therefore, this motion will be denied.

### F.  Motion to Dismiss Claims Already Dismissed – Doc. 185

In the amended complaint [Doc. 60] Plaintiff re-alleged a number of facts concerning the initial stock purchases of both Bellows and Bastanipour, claiming generally that they wrongly paid too little for their shares.  The Court had previously dismissed these claims on statute-of-limitations grounds.  [Doc. 54]  Plaintiff agrees it has only re-alleged these facts to preserve for appeal the question of Bellows' potential liability for the "below market" initial stock purchases.  Defendants, however, are not convinced, and have submitted a detailed order specifying the paragraph numbers of the amended complaint which, in their opinion, contain facts related to the initial-stock-purchase question.  The Court finds it unnecessary to wade into this dispute and engage in such specific delineation.  Plaintiff's claims arising out of the initial stock purchase, at a price of only $2.00 per share, are time-barred.  However, Plaintiff is not precluded from litigating the general issues of whether it was a conflict of interest for Bellows to be both shareholder of and attorney for Plaintiff,

and whether that claimed conflict caused any legally-redressable harm to Plaintiff apart from the allegedly below-market purchase of stock referred to above. This motion will be denied as unnecessary.

**IT IS THEREFORE ORDERED** that:

(1)     Defendants' *Motion for Summary Judgment on All Counts Based on Failure to Present Admissible Evidence as to a Violation of the Standard of Care or Conduct* [Doc. 181] is **DENIED**;

(2)     Defendants' *Motion for Summary Judgment on All Counts Based on Lack of Admissible Evidence of Causation or Damages* [Doc. 184] is **GRANTED IN PART** with respect to certain of Plaintiff's damages claims, and **DENIED IN PART** with respect to others, as more fully explained above;

(3)     Defendants' *Motion for Summary Judgment on Counts IV (Fraud) and V (Tortious Interference With Contract) of the Plaintiff's First Amended Complaint* [Doc. 183] is **GRANTED**, and summary judgment is entered in favor of Defendants on Plaintiff's claims of fraud and tortious interference with contract;

(4)     Defendants' Motion for Summary Judgment on D and O Insurance Claims [Doc. 180] is **GRANTED**, and summary judgment is entered in favor of Defendants on Plaintiff's claims of legal malpractice arising from Defendants' alleged misrepresentations regarding D and O insurance;

(5)     Defendants' Motion for Summary Judgment on Punitive Damages [Doc. 182] is **DENIED** as explained herein; and

(6)     Defendant's Second Motion to Dismiss Stock Purchase Claims [Doc. 185] is **DENIED**.


**UNITED STATES DISTRICT JUDGE**

21